ANDRE LAVALLEE
7/19/2001

1

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF FLORIDA

3

4     ***************************

5     NORKOL/FIBERCORE, INC.,      *

6              Plaintiff     * Case No. 01-14019-CIV

7     vs.                      *     -MIDDLEBROOKS

8     L&P CONVERTERS CORP.,      *

9     STERLING TECHNOLOGY, INC. *    Magistrate Judge

10    and MARTIN R. GUBB,        *        Lynch

11           Defendants     *

12    ***************************

13

14

15         DEPOSITION OF ANDRE LAVALLEE

16           At the Law Offices of

17     CATUOGNO COURT REPORTING SERVICES

18       1414 Main Street, Monarch Place

19      Springfield, Massachusetts 0114

20      July 19, 2001      2:03 p.m.

21

22

23         Deborah R. Leonard

24     Registered Professional Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Providence, RI**

Exhibit A

**ANDRE LAVALLEE**
**7/19/2001**

---

2

1  APPEARANCES:
2
3  Representing the Plaintiffs:
4    ROBERT J. GORMAN, P.A.
5    1209 Delaware Avenue
6    Fort Pierce, Florida 34950
7  BY: ROBERT J. GORMAN, ESQ.
8    (561) 465-5311   FAX (561) 465-5722
9
10
11  Representing the Defendants:
12    HOLLAND & BONZAGNI, P.C.
13    Longmeadow Professional Park
14    171 Dwight Road
15    Longmeadow, Massachusetts 01106
16  BY: DONALD S. HOLLAND, ESQ.
17    (413) 567-2076   FAX (413) 567-2079
18
19
20  In attendance:
21  Karl Thomas
22  Kristen Edwards,
23    Interning Stenographer
24

---

4

1  PAGE                    PAGE
2  Composite Exhibit G, videotape............. 30
3  Composite Exhibit H, purchase orders, under
4    cover sheet "4 Chain Saws"
5    (designated Confidential, Counsel and
6    Experts Only)........................ 30
7  Composite Exhibit I, purchase orders
8    (designated Confidential, Counsel and
9    Experts Only)........................ 30
10  Exhibit 16, production request............. 119
11  Exhibit 17, color laser print of three
12    photographs.......................... 121
13  Exhibit 18, 8/25/00 letter, Clemmons to
14    [redacted]............................ 158
15  Exhibit 19, 10/27/00 letter, Clemmons to
16    [redacted], with attached quote...... 158
17
18    (Exhibits retained by Attorney Gorman)
19
20
21
22
23
24

---

3

1           I N D E X
2
3  DEPONENT: ANDRE LAVALLEE
4
5  CONFIDENTIAL, FOR COUNSEL AND EXPERTS ONLY
6    Pages 16 to 19
7    Pages 89 to 99
8
9  EXAMINATION BY            PAGE
10  Mr. Gorman        5
11  Mr. Holland       175
12
13  FURTHER EXAMINATION BY       PAGE
14  Mr. Gorman        180
15
16  EXHIBIT            PAGE
17  Composite Exhibits C1 through C4, color
18    photographs.......................... 29
19  Composite Exhibit D, Precision paper saw
20    brochure............................. 29
21  Composite Exhibit E, drawings (designated
22    Confidential)........................ 29
23  Composite Exhibit F, blueprints (designated
24    Confidential)........................ 30

---

5

1    ANDRE LAVALLEE, Deponent, having first been
2  duly sworn, deposes and states as follows:
3
4
5    EXAMINATION BY MR. GORMAN:
6
7    Q.  Mr. Lavallee, I'm Bob Gorman. I
8  represent the plaintiff in this action,
9  Norkol/Fibercore Inc. And this is an opportunity
10  for us to get some information that you might
11  personally know or have any information about any
12  of the matters in the case.
13    If, for any reason, you don't
14  understand any of my questions, whether I've
15  mumbled, I've asked an incoherent question, it
16  just doesn't make sense, my accent, my mixed
17  accent, any of that, let me know, okay?
18    A.  All right.
19    Q.  And if you don't indicate you don't
20  understand the question, I'm going to make the
21  assumption that you do understand it. Fair
22  enough?
23    A.  Fine.
24    Q.  For the record, would you tell us

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA      Worcester, MA      Boston, MA      Providence, RI**

**ANDRE LAVALLEE**
**7/19/2001**

6

1  your full name and your residence address.
2  A.    Andre Lavallee, 38 Harrington Road,
3  Charlton, Massachusetts.
4  MR. HOLLAND: And, for the record,
5  we're going to continue with the same
6  stipulations that we did in the earlier
7  deposition?
8  MR. GORMAN: Sure.
9  MR. HOLLAND: Including about the
10  confidentiality. And in this particular
11  instance, there are going to be some
12  instances that are going to be sensitive
13  that I'm not going to know when they --
14  until they occur. And I hate to have
15  Mr. Thomas jumping up and down. I don't
16  think there are going to be that many, but
17  there are some that are going to -- that
18  will undoubtedly occur.
19  MR. GORMAN: We'll address them. I
20  don't think you and I will have any
21  difficulty, Don, in addressing those.
22  MR. HOLLAND: Okay.
23  MR. GORMAN: And I have a pretty
24  good sense of where they might come up.

7

1  We'll try to do that. I've already
2  discussed those aspects with my client's
3  representative.
4  Q.    (By Mr. Gorman) Do you have a
5  middle initial?
6  A.    A.
7  Q.    What do you usually go by?
8  A.    Usually, Andre Lavallee.
9  Q.    Andre, okay.
10  A.    Except in legal papers, I use my
11  middle initial.
12  Q.    Are you more comfortable as Andre?
13  A.    Yes.
14  Q.    As Andy?
15  A.    Yes. Oh, Andy is fine.
16  Q.    Okay. Because, actually, up until
17  today, all's I've ever heard your name referred
18  to was as Andy.
19  A.    Yes.
20  Q.    Is that what people normally call
21  you?
22  A.    Yes.
23  Q.    And I think, just to clarify, I
24  think I caught your address as 38 Harrington

8

1  Road, Charlton, Mass.?
2  A.    Yes.
3  Q.    How long have you resided there?
4  A.    Two years.
5  Q.    Prior to that, where did you live?
6  A.    Thompson, Connecticut.
7  Q.    Okay, where in Thompson? Is that
8  Thompson or Thompsonville?
9  A.    Thompson.
10  Q.    Thompson, okay.
11  A.    On Route 198, I believe it was, in
12  Thompson. I had a house there.
13  Q.    How long did you reside there?
14  A.    Thirteen years.
15  Q.    Now, what's your date of birth?
16  A.    February 14th, '38.
17  Q.    And your social security number?
18  A.    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.
19  Q.    And, currently, you have a
20  Connecticut or a Massachusetts driver's license?
21  A.    Mass.
22  Q.    Have you ever had a Connecticut
23  driver's license?
24  A.    Yes.

9

1  Q.    And place of birth?
2  A.    Southbridge, Massachusetts.
3  Q.    Give me -- well, let me start it
4  this way. Your employer is, currently, L&P
5  Converters Inc.?
6  A.    Yes.
7  Q.    How long have you been employed by
8  L&P Converters?
9  A.    Fifteen years.
10  Q.    Have you ever been employed by
11  Sterling Technologies or Sterling Envelope?
12  A.    No.
13  Q.    What is your current position with
14  Sterling -- or, excuse me, with L&P?
15  A.    Maintenance supervisor.
16  Q.    And what are your duties as
17  maintenance supervisor?
18  A.    To oversee the maintenance of all
19  the machinery, industrial trucks, buildings,
20  tractor trailers.
21  Q.    Okay.
22  A.    That's it.
23  Q.    Who is your immediate supervisor?
24  A.    Martin Gubb.

**ANDRE LAVALLEE**
**7/19/2001**

10

1     Q.   And do you have any employees who
2 you supervise?
3     A.   Three.
4     Q.   And what types of duties do those
5 three employees have?
6     A.   Everything I just mentioned.
7     Q.   Now, when you say maintenance of --
8 I think you said equipment?
9     A.   Machinery.
10     Q.   Machinery?
11     A.   Mm-hmm.
12     Q.   Is that machinery that is utilized
13 by the company in its business?
14     A.   Yes.
15     Q.   Does it include equipment that might
16 be held in inventory for sale?
17     A.   Yes.
18     Q.   And how long have you held the
19 position of maintenance supervisor?
20     A.   Thirteen years.
21     Q.   And prior to that, what was your
22 position?
23     A.   I had my own business.
24     Q.   Okay. Well, I think you've been

11

1 fifteen years with L&P?
2     A.   Mm-hmm.
3     Q.   Thirteen years in this position. So
4 for the first two years, what was your position?
5     A.   Oh, I'm sorry. Just the maintenance
6 mechanic.
7     Q.   Just maintenance mechanic? Do you
8 have any professional licensure or certification,
9 issued by any state?
10     A.   No.
11     Q.   Are you certified by any
12 organizations or associations, professional or
13 otherwise?
14     A.   No.
15     Q.   I'd like to take you back a bit.
16 When did you graduate from high school?
17     A.   '56.
18     Q.   Here in Massachusetts?
19     A.   Yes.
20     Q.   After graduation, what did you do?
21     A.   I went to work for an auto parts
22 company.
23     Q.   Okay. Doing what?
24     A.   Machine shop work.

12

1     Q.   And how long did you work in the
2 machine shop with the auto parts company?
3     A.   All told, about thirty-five years.
4     Q.   Until when?
5     A.   Until I went to work for L&P.
6     Q.   Okay. Were you with the same
7 company during that entire thirty-five years?
8     A.   I was, but I purchased the machine
9 shop. I had that for five years.
10     Q.   Okay.
11     A.   But the same company.
12     Q.   Well, what was the auto parts
13 company?
14     A.   At that time it was called Bousquet.
15 B-O-U-S-Q-U-E-T.
16     Q.   Run that by me again? I'm sorry.
17     A.   B-O-U-S.
18     Q.   Okay.
19     A.   Q-U-E-T.
20     Q.   Okay. Bousquet. And that was an
21 auto parts supplier?
22     A.   Yes.
23     Q.   Or manufacturer?
24     A.   Supplier.

13

1     Q.   Happened to have a machine shop, as
2 an adjunct?
3     A.   Yes. Mm-hmm.
4     Q.   And you worked as a machinist?
5     A.   Yes.
6     Q.   And at what point -- is that the
7 machine shop you purchased?
8     A.   Yes.
9     Q.   When did you purchase the machine
10 shop?
11     A.   Well, just about five years before I
12 started working for L&P.
13     Q.   Okay. So sometime early eighties?
14     A.   Somewheres, yes.
15     Q.   '82 range, something like that?
16     A.   Mm-hmm.
17     Q.   Okay. What happened to the machine
18 shop?
19     A.   I just didn't want part of it
20 anymore.
21     Q.   Did you close it down? Did you sell
22 it?
23     A.   I sold it.
24     Q.   You sold it?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Providence, RI**

ANDRE LAVALLEE
7/19/2001

14

1    A.    Mm-hmm.
2    Q.    Prior to selling it, had you met
3    Martin Gubb?
4    A.    No.
5    Q.    Have you at any time attended any
6    type of courses or training sessions for any type
7    of advanced education, learning, vocation,
8    certificate?
9    A.    I went to a trade school.
10   Q.    Okay. When, and which one?
11   A.    That's where I graduated in '56.
12   Q.    Oh, in '56, okay. Which trade
13   school?
14   A.    It was Kole Trade High. K-O-L-E.
15   Q.    Where is that located?
16   A.    That was in Southbridge.
17   Q.    Are they still there?
18   A.    No.
19   Q.    Okay. And that was for machine
20   operate -- machinists?
21   A.    No.
22   Q.    No?
23   A.    It was for electrical.
24   Q.    Electrical. Okay. And what made

15

1    you decide to make the switch to machinist from
2    electrical?
3    A.    I was always interested in
4    machinery.
5    Q.    And someone had convinced you were
6    supposed to be in electricity, and you finally
7    got to go into what you wanted to?
8    A.    Yeah. Well, when I got out of
9    school, I couldn't find a job.
10   Q.    Okay. Have you, at any time since,
11   engaged in electrical work?
12   A.    Yes, off and on.
13   Q.    Off and on? What type?
14   A.    Houses, mostly.
15   Q.    Okay.
16   A.    And some wiring in the plant.
17   Q.    Okay. What wiring in the plant have
18   you done?
19   A.    Minor. Just lighting, mostly.
20   Q.    Okay. Have you at any time
21   conceived of any new concepts or methods or
22   devices that would be patentable?
23        MR. HOLLAND: Objection, to the
24        extent it calls for a legal conclusion.

CATUOGNO COURT I
Springfield, MA        Worcester, M/

20

1    Q.    Where else have you seen it?
2    A.    **We have another one in the shop.**
3    Q.    Okay. I thought this one was
4    developed, or conceived, and fabricated at L&P?
5    A.    **We did make this one.**
6    Q.    Okay. Where else have you seen one?
7    A.    **I can't say that I've seen one**
8    **anywhere else.**
9    Q.    Have you heard of any others like
10    it?
11    A.    **In magazines.**
12    Q.    What magazines?
13    A.    **I'd have to say the converter**
14    **magazine, Paper, Film, and Foil Converter.**
15    Q.    Now, the ones that you've seen
16    advertised in the converter magazines, are those
17    advertised for sale?
18    A.    **I would guess.**
19    Q.    When did you first see one in these
20    magazines advertised for sale?
21    A.    **When I started working for the**
22    **company.**
23    Q.    When you say the company, you're
24    talking about L&P.

21

1    A.    **Yes.**
2    Q.    And that would have been
3    approximately 1985, 1986?
4    A.    **Early eighties, yes.**
5    Q.    Okay. So you had seen these similar
6    machines in the magazines years before you had
7    conceived of it.
8    A.    **Yes.**
9    Q.    Okay. Now, have you attended any
10    courses in engineering?
11    A.    **No.**
12    Q.    Have you done any design of
13    electrical machinery, electrical systems?
14    A.    **Consulted on them.**
15    Q.    With whom have you consulted?
16    A.    **Company electrician.**
17    Q.    At L&P, as a part of your job.
18    A.    **Yes.**
19    Q.    Now, have you at any time designed
20    any electrical systems for machinery that would
21    be utilized in the company?
22    A.    **No.**
23    Q.    Have you at any time taken
24    photographs of equipment that is located at other

**REPORTING SERVICES**
**Boston, MA        Providence, RI**

locations that are involved in the paper industry?

A. Yes.

Q. What photographs have you taken of equipment at other locations?

A. Well, about three-quarters of the machinery that's in the plant now I purchased, and I've taken pictures of every one of them.

Q. Okay. Have you taken pictures of equipment in other locations that has not been purchased?

A. At times.

Q. Have you taken pictures of any equipment that is mobile in nature?

A. Yes.

Q. What equipment have you taken pictures of that is mobile in nature?

A. A saw.

Q. And when were those pictures taken?

A. I believe it was April of '98.

Q. And where were those photographs taken?

A. I don't recall the name of the company.

Q. Describe the saw that you took pictures of.

A. They had a base, or a turntable. Channel type frame. Upright posts. With an arm coming out of it, with a saw blade on the end. With a hydraulic system.

Q. Anything else about this that you recall?

A. No.

Q. And what was the purpose of taking photographs?

A. To compare it against something we were working on.

Q. "We" being whom?

A. L&P.

Q. And what was it that you were working on?

A. A device to cut paper rolls.

Q. And did you obtain permission to take photographs of that device?

A. Yes, I did.

Q. From whom?

A. The operator of the machine.

Q. And who was that?

A. I don't know the man's name.

Q. Was anyone with you?

A. No.

Q. Describe this operator.

A. He's fairly tall. At least my height, or maybe a little higher, a little taller.

Q. How tall are you?

A. Six feet.

MR. HOLLAND: By any chance, was he wearing a gray cap with a visor and --

MR. GORMAN: Objection, counsel. Well, why don't you give us the photographs.

MR. HOLLAND: That's exactly --

MR. GORMAN: That's what was asked for quite some time ago in discovery.

MR. HOLLAND: Nobody -- it didn't come up in today's deposition yet. I figured --

MR. GORMAN: Well, if you've got them, why don't you give them to me, and we can make it a whole lot easier.

MR. HOLLAND: In addition to those

photographs, here's the brochure you were talking about earlier.

MR. GORMAN: Well, I've got those. But, yeah, what else do you got there for production?

You know, these we had, and they know we've had them because we've actually attached them to stuff we've filed when they say they don't have anything.

MR. HOLLAND: I've got some sketches I'd like marked "Confidential," similar to the blueprints. The majority of these are hand-drawn. There are some that are -- don't look like they're pen and ink. There are some that generated on computer, perhaps?

THE WITNESS: Yes.

MR. HOLLAND: And -- that should assist. (Handing)

We also have the videotape that you were looking for, that we were talking about earlier in our deposition.

MR. GORMAN: Add it to my collection?

**ANDRE LAVALLEE**
**7/19/2001**

26

1   MR. HOLLAND: Okay. This is the one
2   that you can question him. I've got to
3   double-check, but this was the one that
4   was, apparently, taken by Mr. Lavallee.
5   THE WITNESS: Yes.
6   MR. HOLLAND: This one. And that's
7   it.
8   THE WITNESS: It's probably the same
9   tape you have, anyway.
10   MR. GORMAN: We'll get into that.
11   Anything else, counselor?
12   MR. HOLLAND: No, not at this time.
13   MR. GORMAN: For the record, let's
14   go ahead and mark as exhibits -- since
15   these are production. I'd like to go and
16   continue from the numbers we had
17   previously -- so using the letters for what
18   they've produced, the photographs --
19   there's four in number -- will be Composite
20   C. The brochure, Composite D. The
21   drawings, Composite E. The other
22   blueprints and drawings, Composite F. And
23   G for the video?
24   MR. HOLLAND: I also have two

27

1   additional items that I'd like to mark
2   under the second tier, Confidential,
3   Counsel and Experts Only.
4   One is for a device that predates
5   the device at issue, that is sort of a
6   precursor, one made with chain saws. And
7   that's this particular packet that I have.
8   I'd like that marked Confidential, Counsel
9   and Experts Only because it contains not
10   only piece-by-piece of the particular items
11   involved, but where to get them and who the
12   particular vendors are. And I think this
13   information is, clearly, not generally
14   known within the trade, as to the
15   compilation that's involved. So that's
16   one.
17   MR. GORMAN: Well, then you're not
18   claiming it as prior art?
19   MR. HOLLAND: I didn't say that. I
20   leave that up to counsel. For now let's
21   just mark it Confidential, Counsel and
22   Experts Only.
23   Then I have a second packet. This
24   packet deals more with the machine at

28

1   issue. And this one, again, is similar to
2   the one that you have in your hand,
3   Mr. Gorman. It's a -- series of purchase
4   orders for particular parts, etc., and the
5   names of the vendors, which, again, the
6   compilation is something that's not known,
7   generally known, within the trade. And,
8   therefore, for this one, too, we ask that,
9   at least for now, that it be marked
10   Confidential, Counsel and Experts Only.
11   I recognize that this is a matter to
12   be determined later, as to whether or not
13   it should fall into that category. And I
14   leave that up to the counsel for the
15   parties to deal with, either by and amongst
16   themselves or with the court. But here's
17   the second packet.
18   MR. GORMAN: The first packet, with
19   a cover sheet that says "4 Chain Saws," I
20   guess --
21   THE WITNESS: Mm-hmm.
22   MR. GORMAN: -- will be -- I guess
23   that's H.
24   And the next, which I believe will

29

1   be I, is the latest one that is identified,
2   and that's a composite.
3   MR. HOLLAND: And, for the record,
4   there were no other documents that were
5   brought to me yesterday by either of the
6   two deponents today, neither from Alex
7   Infantino nor Andy Lavallee.
8   Further, the production request --
9   the response to production request that I
10   provided to Attorney Gorman earlier today,
11   during the first deposition, applies equal
12   to this particular deposition from the
13   party.
14   With that, I'll leave the
15   questioning to you and sit back.
16
17   (Composite Exhibits C1 through C4,
18   color photographs, marked)
19
20   (Composite Exhibit D, Precision
21   paper saw brochure, marked)
22
23   (Composite Exhibit E, drawings,
24   designated Confidential, marked)

**ANDRE LAVALLEE**
**7/19/2001**

30

```
 1
 2          (Composite Exhibit F, blueprints,
 3     designated Confidential, marked)
 4
 5          (Composite Exhibit G, videotape,
 6     marked)
 7
 8          (Composite Exhibit H, purchase
 9     orders, under cover sheet "4 Chain Saws,"
10     designated Confidential, Counsel and
11     Experts Only, marked)
12
13          (Composite Exhibit I, purchase
14     orders, designated Confidential, Counsel
15     and Experts Only, marked)
16
17          MR. GORMAN: Okay. Just for the
18     record, so to make sure we've got them
19     lined up, we've got C1 through 4 as a
20     composite, which is four photographs. D,
21     which is a copy of gray background, black
22     print, Sterling Technology, Inc. brochure.
23     Composite Exhibit E is a series of drawings
24     and copies of drawings, apparently undated.
```

31

```
 1     Composite F is a series of drawings which
 2     appears to be ink and whiteout, and
 3     photocopy, and ink on photocopy, with some
 4     handwritten notations in places, and
 5     dimensions. These are also undated?
 6          MR. HOLLAND: And E and F are
 7     confidential, to be marked confidential.
 8          MR. THOMAS: Do you want me to go
 9     out of the room when you talk about them?
10          MR. GORMAN: Only the ones that are
11     Confidential, Counsel and Expert Only,
12     which I think was the next two.
13          G -- or, excuse me. G is the video
14     that's been delivered. And H and I are
15     composites of records of -- first one, the
16     cover sheet of "4 Chain Saws," with
17     various, apparently, invoices and purchase
18     orders, with various dates, and has been
19     indicated as Confidential, Counsel and
20     Expert Only, I think?
21          MR. HOLLAND: Right.
22          MR. GORMAN: Okay. And, I, similar:
23     Copies of purchase orders, serial-numbered,
24     and dated. Some may be copies, some with
```

32

```
 1     signatures. Also noted as Confidential,
 2     Counsel and Expert.
 3     Q.   (By Mr. Gorman) Okay, why don't we
 4     just go to the photographs. There's no dates on
 5     these. When were these taken?
 6     A.   There's a date on them.
 7     Q.   There is?
 8     A.   Yes, there is.
 9     Q.   Where's the date on them?
10     A.   Right below my thumb.
11     Q.   Okay. April '98. And do you know
12     whether that was processing date? Or how soon
13     after they were taken were they processed?
14     A.   Probably the next day.
15     Q.   And how far did you travel to take
16     these?
17     A.   I'd say about a hundred miles.
18     Q.   About a hundred miles. So somewhere
19     within a hundred-mile radius. Do you know which
20     direction?
21     A.   They were in southern Connecticut.
22     I can tell you that.
23     Q.   Eastern Graphics?
24     A.   Possibly.
```

33

```
 1     Q.   Possibly?
 2     A.   I'm not sure. It could be.
 3     Q.   How is it that you went down to
 4     Eastern Graphics to take these photographs?
 5     A.   My employer asked me to go down.
 6     Q.   And what did Mr. Gubb tell you?
 7     A.   He said that they had a saw that
 8     they were demonstrating. Or they were -- not
 9     demonstrating, I shouldn't say -- cutting rolls
10     of paper with, at this particular location. I'm
11     not sure of the name. And he asked me to go down
12     and look at it.
13     Q.   Did he tell you why?
14     A.   To see if it was similar to what we
15     were working on.
16     Q.   And at that point, what were you
17     working on?
18     A.   A device similar to that.
19     Q.   And what was your status -- stage of
20     work, or status?
21     A.   We were at the point we had most of
22     it built. But we were trying to run it with a --
23     an electrical motor, with a gearbox.
24     Q.   Yep.
```

**ANDRE LAVALLEE**
**7/19/2001**

---

**34**

1  A.   Which didn't produce a very good
2  cut.
3  Q.   Had a prototype been built?
4  A.   This was the prototype. Or, I'm
5  sorry, there was a prototype before that, which
6  was very crude in nature.
7  Q.   And where is that device currently
8  located?
9  A.   That was all cut up and parts used
10  for different things.
11  Q.   Okay, when was that device
12  fabricated?
13  A.   Mid-1970s.
14  Q.   And by whom was that fabricated?
15  A.   By L&P Converters.
16  MR. HOLLAND: Clarify: What did you
17  say? Mid -- mid what?
18  A.   1970s -- I'm -- '97. I'm sorry. I
19  keep doing that. 1997.
20  Q.   (By Mr. Gorman) And what did they
21  do? Did they ever take that prototype out
22  anywhere?
23  A.   No.
24  Q.   Tested merely inside.

---

**35**

1  A.   Yes.
2  Q.   Now, who, to your understanding,
3  first had the concept for this device? Did you?
4  A.   Yes. Well, myself and Mr. Gubb --
5  Q.   And --
6  A.   -- talked about it.
7  Q.   And when did you and Mr. Gubb
8  conceive of this device?
9  A.   Just before midpart of '97.
10  Q.   And where are the initial drawings
11  of it?
12  A.   We didn't have any drawings. We
13  just fabricated and were experimenting with
14  different things.
15  Q.   When, specifically, did you first
16  present a prototype? Complete a prototype?
17  A.   Probably on towards the midpart of
18  '98.
19  Q.   And there were, prior to that time,
20  no drawings or depictions; is that correct?
21  A.   No drawings till that time, no.
22  Till we made a complete saw.
23  Q.   And that was in mid '98?
24  A.   When we furnished -- finished the

---

**36**

1  first one, yeah.
2  Q.   Okay. And yet you indicate that it
3  was sometime in mid '97 that you first conceived?
4  A.   Yes.
5  Q.   What part -- and what was your
6  contribution in conceiving this device?
7  A.   My knowledge of the paper industry,
8  the machinery.
9  Q.   And what was the purpose, or goal,
10  of the device that you conceived?
11  A.   An alternate method of cutting
12  paper.
13  Q.   Are you an owner in L&P Converters?
14  A.   No, I'm not.
15  Q.   And what was Mr. Gubb's involvement
16  in the conception?
17  A.   I can't say.
18  Q.   Well, was it strictly your
19  conception, then?
20  A.   No. Well, I'm sorry. He offered --
21  something to the effect that we could cut it with
22  a saw.
23  Q.   That was his sole contribution, cut
24  it with a saw?

---

**37**

1  A.   Yes. He said to pursue those ideas,
2  those lines. To cut it with a saw.
3  Q.   And that was his statement to you
4  in, what, mid '97?
5  A.   Actually, we started a long time
6  before that with the chain saws.
7  Q.   That's the way you did it until
8  sometime in 1998 or 1999. Correct?
9  A.   Well, we still have.
10  Q.   You still -- you still use chain
11  saws?
12  A.   Oh, yes.
13  Q.   What percentage of the rolls
14  processed in your plant are done with chain saws?
15  A.   I have no idea. I can't answer that
16  question.
17  Q.   And why not?
18  A.   Because it's not my line. I'm the
19  mechanic, maintenance mechanic.
20  Q.   Who designed the electrical system
21  for this first prototype?
22  A.   My company electrician did.
23  Q.   Is he a licensed electrician?
24  A.   Yes, he is.

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Providence, RI**

ANDRE LAVALLEE
7/19/2001

---

**38**

1  Q.   Journeyman?
2  A.   Master.
3  Q.   And what's his name?
4  A.   Bret, B-R-E-T, Gullifer.
5  G-U-L-L-I-F-E-R.
6  Q.   Bret?
7  A.   Yes.
8  Q.   Gullifer?
9  A.   Right.
10 Q.   Now, of this first prototype, were
11 there any photographs taken?
12 A.   Yes, there was.
13 Q.   Where are they presently?
14 A.   I'm sorry, you're talking about --
15 Q.   Your first prototype in mid '98.
16 A.   -- the chain saw --
17      No, there were no photographs taken.
18 Q.   Okay, now, did this device utilize
19 chain saws?
20 A.   No.
21 Q.   What type of saws did that use?
22 A.   We tried it with an air motor, with
23 a circular knife blade.
24 Q.   What do you mean, a circular knife

---

**39**

1  blade?
2  A.   It's called a slitter blade.
3  Q.   Was there ever a physical
4  description drawn up of this device?
5  A.   No.
6  Q.   Were there drawings made?
7  A.   No.
8  Q.   No drawings made.
9  A.   They kept changing them.  No.
10 Q.   Are any of the -- are there any
11 documents in existence relative to this device?
12 A.   No.
13 Q.   So, as of the spring of '98, you
14 were tinkering with certain ideas, but had no
15 drawings, no final plan, no device designed.
16 Correct?
17 A.   Correct.
18 Q.   You didn't have any methodology
19 drawn out and drafted up, did you?
20 A.   No.
21 Q.   And did Mr. Gubb tell you how he
22 learned about this saw?
23 A.   No, he did not.
24 Q.   And did he go with you on that trip?

---

**40**

1  A.   No.
2  Q.   Where was he at the time?
3  A.   I don't remember.
4  Q.   Did he tell you that he learned
5  about it because the company, Norkol/Fibercore,
6  had offered its roll cutter services to him?
7  A.   He didn't say.
8  Q.   Have you at any time identified
9  yourself to anybody as Mr. Gubb?
10 A.   No.
11 Q.   When you took the photographs in
12 April, did you introduce yourself?
13 A.   As just someone from the L&P
14 Converters.
15 Q.   You didn't give them your name?
16 A.   I probably gave them my name.  I'm
17 not sure.
18 Q.   What did you tell your purpose was?
19 A.   Just to view the saw.
20 Q.   View the saw?
21 A.   Mm-hmm.
22 Q.   Did you express interest in
23 utilizing the company's services?
24 A.   No.  He just asked me to go down and

---

**41**

1  view the saw.
2  Q.   Who is "he"?
3  A.   Mr. Gubb.
4  Q.   Mr. Gubb.  Okay.
5  A.   Mm-hmm.
6  Q.   Now, when you got to that point --
7  A.   Yes.
8  Q.   -- the individual -- who -- how did
9  you get inside the building?
10      MR. HOLLAND:  Objection as to form.
11 Q.   (By Mr. Gorman)  Was there any
12 security there?
13 A.   No.  I went in the office and asked
14 for whoever -- wherever they were cutting paper.
15 Q.   Did you identify yourself?
16 A.   Yes.
17 Q.   As whom?
18 A.   Andre Lavallee.
19 Q.   And did you identify your company?
20 A.   Yes.
21 Q.   And your desire to be there?
22 A.   Just to view the saw.
23 Q.   What time of day was it?
24 A.   I don't recall.

---

**ANDRE LAVALLEE**
**7/19/2001**

---

42

1    Q.  About midday?
2    A.  I don't believe -- no, it wasn't
3  night. It was daytime.
4    Q.  About midday?
5    A.  Oh, possibly. I don't know. I
6  don't remember.
7    Q.  Lunchtime, perhaps?
8    A.  I don't remember.
9    Q.  Was the machine being operated when
10  you got to it?
11    A.  Yes.
12    Q.  How long were you there?
13    A.  Half an hour.
14    Q.  How many photographs did you take?
15    A.  Four.
16    Q.  In a half hour, you only took four
17  photographs?
18    A.  That's all I had in the camera.
19    Q.  Did you identify yourself to the
20  individual operating the equipment?
21    A.  Yes.
22    Q.  How did you introduce yourself?
23    A.  My name and company.
24    Q.  And did you deliver these to

---

43

1  Mr. Gubb?
2    A.  I showed them to him, yes.
3    Q.  When did you show the photographs to
4  Mr. Gubb?
5    A.  I don't remember exactly.
6    Q.  These photographs here, are these
7  the originals?
8    A.  Yes.
9    Q.  The original ones?
10    A.  Yep.
11    Q.  Has there been any copies made of
12  these?
13    A.  No.
14    MR. HOLLAND: So on that -- what do
15  you want to do, for mechanics?
16    MR. GORMAN: Color laser photos.
17  Color laser prints. Easiest things to do
18  it.
19    MR. HOLLAND: Can we keep the
20  originals, and you'll make a copy? And
21  we'll make an agreement to substitute them?
22    MR. GORMAN: Yeah. I want to get a
23  copy of the backs, as to dates and
24  processing.

---

44

1    MR. HOLLAND: Sure. But you would
2  return the originals within thirty days?
3    MR. GORMAN: Sooner. I'll be glad
4  to provide you with not only the originals,
5  but two to three copies. With all the
6  different counsel involved, just tell me
7  who to send them to.
8    Q.  (By Mr. Gorman) What did Mr. Gubb
9  say when you showed him these photographs?
10    A.  He said it was similar to ours.
11    Q.  Well, you didn't have a device
12  planned or built at that time, did you?
13    A.  Oh, we were working on one.
14    Q.  But you had no plans, did you?
15    A.  No.
16    Q.  Did you check as to -- was a patent
17  search conducted at that time?
18    A.  I don't believe so.
19    Q.  Did the -- did you ascertain whether
20  or not -- did you -- strike that.
21    Did you make an inspection of this
22  equipment, closely?
23    A.  No.
24    Q.  In what way was this similar to what

---

45

1  you were working on?
2    MR. HOLLAND: Objection as to form.
3  Please define "similar" or ask the witness.
4    Q.  (By Mr. Gorman) What components or
5  methodologies of this machine in C1 were similar
6  to what you and Mr. Gubb were working on?
7    MR. HOLLAND: Same objection.
8    A.  Turntable and the post.
9    Q.  (By Mr. Gorman) Turntable and a
10  post.
11    A.  Mm-hmm.
12    Q.  Okay. How about the lateral arm?
13    A.  There was an arm, yes.
14    Q.  Now, at that time, you were building
15  one that you subsequently decided didn't work
16  properly. Correct?
17    A.  Mm-hmm.
18    Q.  Is that a yes?
19    A.  Yes.
20    Q.  And did anybody -- have you ever
21  seen any other photographs of this -- of this
22  device?
23    A.  Of that? No.
24    Q.  Of any one similar to it, other than

---

**ANDRE LAVALLEE**
**7/19/2001**

62

1   A.   He did.
2   Q.   And when did he tell you that?
3   A.   I don't remember.
4   Q.   Well, was it in the last six months?
5   A.   I don't remember.
6   Q.   Was it in the past year?
7   A.   I would say so, but I'm not sure.
8   I'm just --
9   Q.   Okay. Was it before you took these
10  photographs, Exhibit C?
11  A.   No.
12  Q.   Was it before the photographs were
13  taken for the brochure?
14  A.   I don't know.
15  Q.   Did you assign the concept to
16  Mr. Gubb in writing?
17  A.   He gave me a paper from an attorney
18  to sign.
19  Q.   And when did you sign it?
20  A.   I don't remember.
21  Q.   You don't remember. Did you keep a
22  copy of it?
23  A.   No.
24  Q.   Okay. So you took something -- did

63

1   you take it to an attorney to be reviewed?
2   A.   No.
3   Q.   He gave you something, told you to
4   sign it, you signed it?
5   A.   Mm-hmm.
6   Q.   Is that yes?
7   A.   Yes.
8   Q.   You didn't keep a copy of it.
9   A.   No.
10  Q.   Did he pay you?
11  A.   No.
12       MR. HOLLAND: Good time for a break?
13       MR. GORMAN: Sure. Why not.
14
15       (A recess was taken)
16
17       MR. GORMAN: Let me just clarify,
18  regroup here a second.
19  Q.   (By Mr. Gorman) You and Mr. Gubb
20  first had conversations about this concept, where
21  he said, you know, "Use a saw." Now, at that
22  time, there was no concept, no method. He just
23  says, "Well, maybe we can use a saw." Correct?
24  A.   Correct.

64

1   Q.   And there was -- until you got into
2   the development of the 60 machine, did you have
3   any drawings? Is that correct?
4   A.   No drawings, no.
5   Q.   None.
6   A.   No.
7   Q.   So, in other words, correct, until
8   you got into that -- so the first, even,
9   conversations of using saws, without any
10  discussion of a device or a methodology, was in
11  mid '97. Correct?
12  A.   No. Because we built chain saws
13  prior to that.
14  Q.   Well, okay. Chain saws. But what
15  do you mean -- chain saws you built. What do you
16  mean? You built chain saws?
17  A.   We built chain saws to cut rolls of
18  paper.
19  Q.   Okay. And, now, that was -- that
20  was on -- laying them horizontal --
21  A.   Horizontally, yeah.
22  Q.   -- and cutting down through them.
23  Right?
24  A.   Yes.

65

1   Q.   When's the first time you tried
2   anything to cut paper rolls while they were in a
3   vertical?
4   A.   We started doing that in mid '97.
5   Probably towards the end of '97. Mid to
6   three-quarters of the way through '97.
7   Q.   This is where you first started
8   getting the concept?
9   A.   Yes.
10  Q.   Okay. And there are no diaries or
11  anything else --
12  A.   No. We just --
13  Q.   -- evidencing dates or anything
14  else. Correct?
15  A.   Nope.
16  Q.   And the concepts that you had did
17  not work. Correct?
18  A.   Did not work the way we wanted them
19  to, no.
20  Q.   Okay. Now, you then started working
21  on a different design?
22  A.   Mm-hmm.
23  Q.   And that was early '98.
24  A.   Yeah. At the end of '97, early '98.

ANDRE LAVALLEE
7/19/2001

66

1   Q.   And that evolved into the 60-inch --
2   A.   Yes.
3   Q.   -- turntable
4   A.   Yes.
5   Q.   Now, did the one that you were
6   working on before have a turntable?
7   A.   Yes.
8   Q.   Did it have a post?
9   A.   Yes.
10  Q.   And the -- okay. Now, did you share
11  your ideas with anybody but Mr. Gubb?
12  A.   Well, basically, every one in the
13  plant. But Mr. Gubb and myself are the ones that
14  conferred on it, mostly.
15  Q.   Oh, okay. So you had -- this was
16  being spread among -- how many people worked in
17  the plant at that time?
18  A.   Well, there's fifty people that
19  worked there.
20  Q.   And everybody knew about what was
21  going on?
22  A.   Well, yeah. The shop's right out in
23  the open.
24  Q.   Okay. Now, did you have discussions

67

1   about what you were attempting to do --
2   A.   No.
3   Q.   -- with Alex Infantino?
4   A.   Not at that time.
5   Q.   Okay. Now, did you talk to anybody
6   outside the company?
7   A.   Just my electrician.
8   Q.   Okay. Now, he's not an employee
9   then, the electrician?
10  A.   No. He's on call.
11  Q.   So he's an electrical contractor in
12  the area?
13  A.   Yeah. But he works for someone
14  else.
15  Q.   Who does he work for?
16  A.   A company called LeBlanc,
17  L-E-B-L-A-N-C, Electric.
18  Q.   Okay. So Bret works as an employee
19  of LeBlanc Electric.
20  A.   Yes.
21  Q.   Is he a licensed electrical
22  contractor?
23  A.   Yes.
24  Q.   Is he an owner in LeBlanc Electric?

68

1   A.   Not at that time.
2   Q.   Was he a licensed electrical
3   contractor at that time?
4   A.   Yes.
5   Q.   And what information was given to
6   him? And when was he first retained on this
7   project?
8   A.   Mid '97. And we just told him what
9   we were trying to do.
10  Q.   What did you tell him?
11  A.   That we were trying to build
12  something to cut rolls of paper.
13  Q.   Did you tell him anything more?
14  A.   Basically, no.
15  Q.   Did he submit invoices for his work?
16  A.   I don't recall. I don't know.
17  Q.   Did -- was he paid for his work at
18  any point in time?
19  A.   I would guess that he was. I'm just
20  guessing.
21  Q.   Who would approve those?
22  A.   The office.
23  Q.   Who in the office?
24  A.   Margaret DiSantis.

69

1   Q.   What's her position?
2   A.   The office manager.
3   Q.   And how was she provided with
4   information, to know whether the work was
5   performed or not?
6   A.   She must have got an invoice from
7   them. I don't know. I don't get involved with
8   that.
9   Q.   Okay. Would she have had a
10  responsibility to ascertain if the services had
11  actually been performed and the payment was due?
12  A.   Not as a rule.
13  Q.   Okay. Would it have been required
14  to be approved by Martin Gubb?
15  A.   I believe so.
16  Q.   Who laid out the brochure?
17  A.   I'm not sure.
18  Q.   Did you lay it out?
19  A.   No.
20  Q.   Did you have any involvement in it,
21  other than taking the photographs?
22  A.   No.
23  Q.   Okay, now, after the prototype was
24  scrapped and you started on the next machine --

**ANDRE LAVALLEE**
**7/19/2001**

---

70

1    A.    Yes.
2    Q.    -- when was that machine completed?
3    A.    Early part of '98.
4    Q.    How long did it take to build it?
5    A.    Three, maybe four months.
6    Q.    Okay. So when you say early part of
7  '98, when in -- what month in '98 was it
8  completed?
9    A.    I'm not sure.
10   Q.    Was it completed before these
11 photographs were taken, Exhibit C?
12   A.    No.
13   Q.    As of the time these photographs
14 were taken by you, what was the percentage of
15 completion or status of the saw number 1?
16   A.    I may correct that. The saw was
17 built. We changed the hydraulic motor on it, to
18 drive the saw blade.
19   Q.    Why is that?
20   A.    We were using an electric motor with
21 a gearbox.
22   Q.    Why did you change it to hydraulic?
23   A.    Because it seemed to work better
24 when we saw this saw.

---

71

1    Q.    In other words, you decided that
2  this saw was a better saw.
3    A.    I said the motor was working better.
4    Q.    Now, do you customarily drive one
5  hundred miles each way for your business, for the
6  company?
7    A.    Rephrase that.
8    Q.    Well, as a part of your normal
9  duties, do you drive a hundred miles a day?
10   A.    No.
11   Q.    Do you drive two hundred miles a
12 day?
13   A.    No.
14   Q.    You're normally right there at the
15 plant, aren't you?
16   A.    Most times.
17   Q.    Has Mr. Gubb, at any time since,
18 sent you out to do any other photo surveillance?
19       MR. HOLLAND: Objection as to form.
20   A.    To do surveillance?
21   Q.    (By Mr. Gorman) Sure. Mr. Gubb
22 send you out to do -- take photographs of other
23 equipment around?
24   A.    All kinds.

---

72

1    Q.    Of competitors?
2        MR. HOLLAND: Objection as to form.
3    A.    Of machinery for sale.
4    Q.    (By Mr. Gorman) Well, did anyone
5  tell you that this saw was for sale?
6    A.    No.
7    Q.    Exhibit C?
8    A.    No.
9    Q.    Did he tell you that he had been
10 told it was for sale?
11   A.    No. He didn't confide in me, no.
12   Q.    Has he sent you out to photograph
13 envelope makers?
14   A.    No.
15   Q.    What types of equipment has he sent
16 you out to photograph besides this saw?
17   A.    Converting machinery.
18   Q.    What type of converting machinery?
19   A.    Rewinders, sheeters, guillotines.
20   Q.    Produced by competitors?
21   A.    No. Paper -- the machines that we
22 use in the plant.
23   Q.    And how many times has he sent you
24 out to photograph somebody else's equipment that

---

73

1  he is not looking at to purchase, where you've
2  traveled more than a hundred miles each way?
3    A.    Don't recall.
4    Q.    More than once?
5    A.    I don't recall. I don't know if I
6  ever did or not. I'm not sure.
7    Q.    Now, you traveled that day more than
8  two hundred miles. Did you seek reimbursement
9  for your mileage?
10   A.    No. It was one -- I was on the
11 payroll.
12   Q.    Pardon?
13   A.    I was on the payroll.
14   Q.    Well, how are you compensated? Are
15 you salary? Hourly?
16   A.    Hourly.
17   Q.    And you weren't reimbursed for
18 travel?
19   A.    No.
20   Q.    You take your car or the company
21 car?
22   A.    Company car.
23   Q.    Is there a log kept on the company
24 car?

---

**ANDRE LAVALLEE**
**7/19/2001**

74

1  A.  No.
2  Q.  Do you always have the company car?
3  A.  Not on my – not at my disposal.
4  Just at the plant.
5  Q.  What was the company car at that
6  time?
7  A.  It was a pickup truck.
8  Q.  And Mr. Gubb, was he in
9  Massachusetts at the time you were sent down
10 there?
11 A.  I don't recall.
12 Q.  Well, when you showed him the
13 photographs, was he in Massachusetts?
14 A.  Yes.
15 Q.  And how long after they were taken
16 was that?
17 A.  I don't recall.
18 Q.  How often does Mr. Gubb come to
19 Massachusetts?
20 A.  At the moment, about every five or
21 six weeks.
22 Q.  How about during 1998?
23 A.  I don't recall.
24 Q.  Would it be a fair statement that

75

1  you don't recall when the first machine was
2  completed?
3  A.  To the exact date?
4  Q.  Okay, are there any documents that
5  would evidence when that first machine was
6  completed?
7  A.  No.
8  Q.  Are there any documents that would
9  indicate when any of the other machines were
10 completed?
11 MR. HOLLAND: Objection as to form.
12 A.  Not really as the complete units,
13 no.
14 Q.  (By Mr. Gorman) Did you at any time
15 provide, by fax, drawings to Alex Infantino?
16 A.  Yes.
17 Q.  When was that?
18 A.  At various times.  He continually
19 makes parts for me.
20 Q.  When did you first forward to him
21 any drawings for parts for these Precision paper
22 saws?
23 A.  Towards the end of '97.  Early '98.
24 Q.  And do you have those drawings?

76

1  A.  You have some in there.
2  Q.  Okay.  I'm assuming that would be E
3  or F?
4  A.  I don't know.
5  Q.  Let's take Composite E.
6  A.  Mm-hmm.  Yep.
7  Q.  Tell us what those are, please.
8  A.  That's a turntable.
9  Q.  Well, that's the top drawing.
10 That's the turntable.
11 A.  Yeah.
12 Q.  What -- who prepared these drawings?
13 A.  I sketched some out, and he
14 formalized them.  The other ones I just drew
15 myself.
16 Q.  Right.  Well, going through
17 Composite Exhibit E, which of those did you draw?
18 A.  I sketched this out and gave him an
19 idea, and he completed it and refined it.
20 Q.  Well, where is your original
21 sketches?
22 A.  I don't have an original sketch for
23 that part of it.
24 Q.  But that part of it being the first

77

1  page of Composite E?
2  A.  Yes.
3  Q.  Why don't you have a sketch of it?
4  A.  I really can't answer that.  I don't
5  know.
6  Q.  Did you have a sketch of that?
7  A.  Yes, I did.
8  Q.  And what did you do with that
9  sketch?
10 A.  I'm not sure.
11 Q.  Have you looked for that sketch?
12 A.  I can tell you, it's not in the
13 folder.
14 Q.  What folder is that?
15 A.  The folder where all of this was.
16 Q.  When did you last see the original
17 sketch?
18 A.  I don't know.
19 Q.  Was that original sketch dated?
20 A.  No.
21 Q.  Were any of the drawings dated?
22 A.  None of mine were dated.
23 Q.  So you don't know when they were
24 prepared, do you?

**ANDRE LAVALLEE**
**7/19/2001**

158

1  documents and information that he sent out?
2      A.   No.
3          MR. GORMAN:  Number 18.
4
5          (Exhibit 18, 8/25/00 letter,
6  Clemmons to [redacted], marked)
7
8          (Exhibit 19, 10/27/00 letter,
9  Clemmons to [redacted], with attached
10 quote, marked)
11
12     Q.   (By Mr. Gorman)  Let me show you
13 Exhibit No. 18 and ask you if you've seen that
14 before.
15     A.   I haven't seen this paper, no.
16     Q.   Who did you answer to at the L&P
17 Converters plant, on Route 679, on a day-to-day
18 basis?
19     A.   Who did I answer to?
20     Q.   Yeah.
21     A.   No one except Mr. Gubb.
22     Q.   So you, basically, were the senior
23 person there?
24     A.   No.  In maintenance, yes.  Everybody

159

1  has their own job.
2      Q.   Well, why would maintenance be the
3  ones -- what other departments were there?
4      A.   There's production.  And there was
5  traffic.
6      Q.   Yep.
7      A.   Shipping and receiving.
8      Q.   Okay.  What's the difference between
9  traffic and shipping and receiving?  Or are you
10 using them interchangeably?
11     A.   Well, we have a ship -- we have a
12 traffic manager and people who do strictly
13 shipping and receiving in the warehouse.
14     Q.   Okay.  I'm not sure I understand,
15 but what duties would the traffic manager have
16 that would not be related to shipping and
17 receiving?
18     A.   Well, actually, none.  But there are
19 people who work in the shipping and the receiving
20 end, in the warehouse, that don't have anything
21 to do with the traffic.
22     Q.   Okay.  Now, so we've got maybe four
23 departments.  Are there more than that?
24     A.   Oh, the office.

160

1      Q.   Office.  Okay.  Well, can you
2  explain to us why you, as maintenance, would be
3  the one they'd ship materials for, as a part of a
4  promotional campaign to sell an expensive piece
5  of equipment?
6      A.   Rephrase that, please?
7          MR. GORMAN:  Read it back, please.
8
9          (Record was read back)
10
11     A.   I don't know what you mean by
12 shipping material.
13     Q.   (By Mr. Gorman)  Well, it says here,
14 "Ship the roll to L&P Converters, Route 12,
15 number 1800, in care of Mr. Andy Lavallee."  You
16 weren't in receiving, were you?
17     A.   No.
18     Q.   You weren't in production, were you?
19     A.   No.
20     Q.   Did you wear the --
21     A.   Why they did that I don't know.
22     Q.   Did you wear the jacket and tie for
23 me today?
24     A.   Of course I did.

161

1      Q.   You did.  I'm impressed.  Is that
2  how you dress for work every day?
3      A.   No.
4      Q.   Is that how you went to the office?
5  Did you go to work earlier today?
6      A.   I dress informally.
7      Q.   Did you go to work earlier today?
8      A.   No.  I'm on vacation.
9      Q.   Oh, I'm sorry to pull you from your
10 vacation.  I apologize for that, you know.
11     A.   Accepted.
12     Q.   Did rolls come in, under this
13 program?
14     A.   We may have gotten a couple of
15 different rolls.  I'm -- you know, that I can
16 remember.  I don't remember who it was for or --
17     Q.   And there were -- they came to
18 you -- they dropped them by your office, or what?
19     A.   Oh, no.  I was just told that they
20 were there.
21     Q.   What did you do?
22     A.   I arranged to make sure the operator
23 knew what he had to do with the roll.
24     Q.   In other words, production.

**ANDRE LAVALLEE**
**7/19/2001**

162

1   A.  Mmm.
2   Q.  You gave instructions to production?
3   A.  Yes.
4   Q.  Who is the production manager?
5   A.  Right now it's Milton Soto.
6   Q.  Who was then, in --
7   A.  Marcial Alicea.
8   Q.  He's one of the operators. He's
9 also production manager?
10   A.  No. The operator?
11   Q.  Wait a second. Marcello Alicea.
12 That's one of your --
13   A.  No. Senior.
14   Q.  So you got two Marcellos?
15   A.  Marcial Alicea, Jr., worked for me.
16 Marcial Alicea, Sr., was a production manager.
17   Q.  Okay. And why isn't it that that
18 was directed to Marcello Alicea, Sr.?
19   A.  I have no idea. I don't know.
20   Q.  Well, when did you first become
21 aware that these were going out like that?
22   A.  I can't say that I ever really saw
23 that. But --
24   Q.  Well --

163

1   A.  I didn't pay any attention to it.
2 Somebody told me about a roll of paper; I just
3 passed it on.
4   Q.  Number 19, had you seen that
5 previously?
6   A.  No. I can't say that I've seen
7 this, either.
8   Q.  To your knowledge, does L&P
9 Converters have product liability insurance?
10   A.  I believe they have, yes.
11   Q.  Do you have any involvement in
12 arranging that?
13   A.  No.
14   Q.  Do you have any information as to
15 the limits of coverage?
16   A.  No.
17   Q.  Do you know whether or not that
18 insurance provides any coverages for defense of
19 patent infringement?
20   A.  I don't know.
21   MR. GORMAN: (Indicating)
22   MR. HOLLAND: I appreciate the
23 compliment. But, no, I don't -- I'm not
24 into that.

164

1   MR. GORMAN: Well, I mean, that's --
2 you know, it would probably make this case
3 a lot easier.
4   Q.  (By Mr. Gorman) In the time that
5 you've been utilizing the Precision paper saws at
6 L&P, have there been any injuries?
7   A.  No.
8   Q.  Who would have records as to the --
9 strike that.
10   Who, if anyone, would have records
11 as to the actual usage of the three different
12 saws?
13   A.  I'm not sure who has the records.
14   Q.  But the production manager is
15 Marcial Alicea, Sr.
16   A.  At -- no, now it's Milton Soto.
17   Q.  Did Marcial leave the company?
18 Senior?
19   A.  Yes. He retired.
20   Q.  He retired, okay. When did he
21 retire?
22   A.  About a year, year and a half ago,
23 somewhere around there.
24   The name that you were looking for

165

1 before, that Jose is Collazo [phonetic].
2   Q.  Yazo, Y-A-Z-O?
3   A.  No. Collazo. C-O-L-I-Z-I --
4   Q.  I-Z-O?
5   A.  C-O-L-I -- I'm not sure if it's an
6 S-O or a Z-O. I'm not sure.
7   Q.  Colizo?
8   A.  I'm sorry. L-I-A-Z-O, probably.
9   Q.  During the time of the deposition
10 here this afternoon, Mr. Lavallee --
11   A.  Mm-hmm.
12   Q.  -- have you recovered any
13 recollection of any communications with the
14 gentleman sitting to my left?
15   A.  Yes. Now I --
16   Q.  What do you remember about the
17 gentleman sitting to my left?
18   A.  I just remember that he -- we had a
19 demonstration for him.
20   Q.  Do you recall when that
21 demonstration was done?
22   A.  No, I don't remember.
23   Q.  Do you recall whether he was
24 accompanied by any other individual when that

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Providence, RI**

Westlaw.

Date of Printing: OCT 28,2004

### KEYCITE

▷**Al-Site Corp. v. VSI Intern., Inc., 174 F.3d 1308, 50 U.S.P.Q.2d 1161 (Fed.Cir., Mar 30, 1999) (NO. 97-1593, 98-1008)**

History
Direct History

**H**    1  HANGER FOR DISPLAYING EYEGLASSES, US PAT 4976532, 1990 WL 915120 (U.S. PTO Utility Dec 11, 1990) (NO. 278546)
*Ruled Valid and Infringed by*

=>    2  **Al-Site Corp. v. VSI Intern., Inc.**, 174 F.3d 1308, 50 U.S.P.Q.2d 1161 (Fed.Cir. Mar 30, 1999) (NO. 97-1593, 98-1008), rehearing denied, in banc suggestion declined (May 25, 1999) (BNA Version)

*On Remand to*

**H**    3  Al-Site Corp. v. VSI Intern., Inc., 144 F.Supp.2d 1322, 53 U.S.P.Q.2d 1158 (S.D.Fla. Aug 31, 1999) (NO. 91847CIVHIGHSMITH, 922016CIVHIGHSMITH, 941920CIVHIGHSMITH), reconsideration denied (Oct 21, 1999) (BNA Version)
*Mandamus Denied by*

**H**    4  In re Al-Site Corp., 230 F.3d 1380 (Fed.Cir. Feb 01, 2000) (TABLE, TEXT IN WESTLAW, NO. 607)


▶    5  HANGER FOR DISPLAYING EYEGLASSES, US PAT 5144345, 1992 WL 1102645 (U.S. PTO Utility Sep 01, 1992) (NO. 606179)
*Ruled Valid and Infringed by*

**H**    6  Al-Site Corp. v. Opti-Ray, Inc., 841 F.Supp. 1318, 28 U.S.P.Q.2d 1915 (E.D.N.Y. Aug 31, 1993) (NO. CV-92-4205) (BNA Version)


▶    7  HANGER FOR DISPLAYING EYEGLASSES, US PAT 5144345, 1992 WL 1102645 (U.S. PTO Utility Sep 01, 1992) (NO. 606179)
*Construed by*

**H**    8  Al-Site Corp. v. Bonneau Co., 1993 WL 616705, 30 U.S.P.Q.2d 1123 (C.D.Cal. Nov 23, 1993) (NO. CV 92-7533 DT (TX)) (BNA Version)
*AND Ruled Not Infringed by*

▶    9  Magnivision, Inc. v. Bonneau Co., 33 F.Supp.2d 1218 (C.D.Cal. Oct 13, 1998) (NO. CV 91-2167 DT TX, CV 92-7553 DT JGX, CV 97-8351 DT JGX)
*Affirmed in Part, Reversed in Part by*

**H**    10  Magnivision, Inc. v. Bonneau Co., 250 F.3d 758 (Fed.Cir. Jun 15, 2000) (TABLE, TEXT IN WESTLAW, NO. 99-1093, 99-1108, 99-1094, 99-1105), rehearing and rehearing en banc denied (Jul 24, 2000)


▶    11  HANGER FOR DISPLAYING EYEGLASSES, US PAT 5144345, 1992 WL 1102645 (U.S. PTO Utility Sep 01, 1992) (NO. 606179)
*Ruled Valid and Infringed by*

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

Exhibit B

=>  12  **Al-Site Corp. v. VSI Intern., Inc.,** 174 F.3d 1308, 50 U.S.P.Q.2d 1161 (Fed.Cir. Mar 30, 1999) (NO. 97-1593, 98-1008), rehearing denied, in banc suggestion declined (May 25, 1999) (BNA Version)
*On Remand to*

H   13  Al-Site Corp. v. VSI Intern., Inc., 144 F.Supp.2d 1322, 53 U.S.P.Q.2d 1158 (S.D.Fla. Aug 31, 1999) (NO. 91847CIVHIGHSMITH, 922016CIVHIGHSMITH, 941920CIVHIGHSMITH), reconsideration denied (Oct 21, 1999) (BNA Version)
*Mandamus Denied by*

H   14  In re Al-Site Corp., 230 F.3d 1380 (Fed.Cir. Feb 01, 2000) (TABLE, TEXT IN WESTLAW, NO. 607)

►   15  HANGER FOR DISPLAYING EYEGLASSES, US PAT 5144345, 1992 WL 1102645 (U.S. PTO Utility Sep 01, 1992) (NO. 606179)
*Ruled Valid and Infringed by*

H   16  Magnivision, Inc. v. Bonneau Co., 250 F.3d 758 (Fed.Cir. Jun 15, 2000) (TABLE, TEXT IN WESTLAW, NO. 99-1093, 99-1108, 99-1094, 99-1105), rehearing and rehearing en banc denied (Jul 24, 2000)

H   17  HANGER FOR DISPLAYING EYEGLASSES, US PAT 5260726, 1993 WL 1206743 (U.S. PTO Utility Nov 09, 1993) (NO. 930815)
*Ruled Valid and Infringed by*

=>  18  **Al-Site Corp. v. VSI Intern., Inc.,** 174 F.3d 1308, 50 U.S.P.Q.2d 1161 (Fed.Cir. Mar 30, 1999) (NO. 97-1593, 98-1008), rehearing denied, in banc suggestion declined (May 25, 1999) (BNA Version)
*On Remand to*

H   19  Al-Site Corp. v. VSI Intern., Inc., 144 F.Supp.2d 1322, 53 U.S.P.Q.2d 1158 (S.D.Fla. Aug 31, 1999) (NO. 91847CIVHIGHSMITH, 922016CIVHIGHSMITH, 941920CIVHIGHSMITH), reconsideration denied (Oct 21, 1999) (BNA Version)
*Mandamus Denied by*

H   20  In re Al-Site Corp., 230 F.3d 1380 (Fed.Cir. Feb 01, 2000) (TABLE, TEXT IN WESTLAW, NO. 607)

►   21  HANGER FOR DISPLAYING EYEGLASSES, US PAT 5521911, 1996 WL 1395993 (U.S. PTO Utility May 28, 1996) (NO. 365100)
*Ruled Not Infringed by*

►   22  Magnivision, Inc. v. Bonneau Co., 33 F.Supp.2d 1218 (C.D.Cal. Oct 13, 1998) (NO. CV 91-2167 DT TX, CV 92-7553 DT JGX, CV 97-8351 DT JGX)
*Affirmed in Part, Reversed in Part by*

H   23  Magnivision, Inc. v. Bonneau Co., 250 F.3d 758 (Fed.Cir. Jun 15, 2000) (TABLE, TEXT IN WESTLAW, NO. 99-1093, 99-1108, 99-1094, 99-1105), rehearing and rehearing en banc denied (Jul 24, 2000)

►   24  HANGER FOR DISPLAYING EYEGLASSES, US PAT 5521911, 1996 WL 1395993 (U.S. PTO Utility May 28, 1996) (NO. 365100)
*Ruled Valid and Infringed by*

=>  25  **Al-Site Corp. v. VSI Intern., Inc.,** 174 F.3d 1308, 50 U.S.P.Q.2d 1161 (Fed.Cir. Mar 30, 1999) (NO. 97-1593, 98-1008), rehearing denied, in banc suggestion declined (May 25, 1999) (BNA Version)
*On Remand to*

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

**H**    26  Al-Site Corp. v. VSI Intern., Inc., 144 F.Supp.2d 1322, 53 U.S.P.Q.2d 1158 (S.D.Fla. Aug 31, 1999) (NO. 91847CIVHIGHSMITH, 922016CIVHIGHSMITH, 941920CIVHIGHSMITH), reconsideration denied (Oct 21, 1999) (BNA Version)

*Mandamus Denied by*

**H**    27  In re Al-Site Corp., 230 F.3d 1380 (Fed.Cir. Feb 01, 2000) (TABLE, TEXT IN WESTLAW, NO. 607)

**►**    28  HANGER FOR DISPLAYING EYEGLASSES, US PAT 5521911, 1996 WL 1395993 (U.S. PTO Utility May 28, 1996) (NO. 365100)

*Ruled Not Infringed by*

**H**    29  Magnivision, Inc. v. Bonneau Co., 250 F.3d 758 (Fed.Cir. Jun 15, 2000) (TABLE, TEXT IN WESTLAW, NO. 99-1093, 99-1108, 99-1094, 99-1105), rehearing and rehearing en banc denied (Jul 24, 2000)

**►**    30  Al-Site Corp. v. VSI Intern., Inc., 1997 WL 579201, 42 U.S.P.Q.2d 1876 (S.D.Fla. Feb 06, 1997) (NO. 91-0847-CIV-ATKINS, 92-2016-CIV-ATKINS, 94-1920-CIV-ATKINS) (BNA Version)

*Judgment Affirmed in Part, Reversed in Part by*

**=>**    31  **Al-Site Corp. v. VSI Intern., Inc.,** 174 F.3d 1308, 50 U.S.P.Q.2d 1161 (Fed.Cir. Mar 30, 1999) (NO. 97-1593, 98-1008), rehearing denied, in banc suggestion declined (May 25, 1999) (BNA Version)

*On Remand to*

**H**    32  Al-Site Corp. v. VSI Intern., Inc., 144 F.Supp.2d 1322, 53 U.S.P.Q.2d 1158 (S.D.Fla. Aug 31, 1999) (NO. 91847CIVHIGHSMITH, 922016CIVHIGHSMITH, 941920CIVHIGHSMITH), reconsideration denied (Oct 21, 1999) (BNA Version)

*Mandamus Denied by*

**H**    33  In re Al-Site Corp., 230 F.3d 1380 (Fed.Cir. Feb 01, 2000) (TABLE, TEXT IN WESTLAW, NO. 607)

**▷**    34  Magnivision, Inc. v. Bonneau Co., 115 F.3d 956, 42 U.S.P.Q.2d 1925 (Fed.Cir.(Cal.) Jun 09, 1997) (NO. 95-1093), rehearing denied, in banc suggestion declined (Aug 08, 1997) (BNA Version)

*Certiorari Denied by*

**H**    35  Bonneau Co. v. Magnivision, Inc., 522 U.S. 1090, 118 S.Ct. 880, 139 L.Ed.2d 869, 66 USLW 3355, 66 USLW 3489, 66 USLW 3490 (U.S. Jan 26, 1998) (NO. 97-785)

*AND On Remand to*

**►**    36  Magnivision, Inc. v. Bonneau Co., 33 F.Supp.2d 1218 (C.D.Cal. Oct 13, 1998) (NO. CV 91-2167 DT TX, CV 92-7553 DT JGX, CV 97-8351 DT JGX)

*Affirmed in Part, Reversed in Part by*

**H**    37  Magnivision, Inc. v. Bonneau Co., 250 F.3d 758 (Fed.Cir. Jun 15, 2000) (TABLE, TEXT IN WESTLAW, NO. 99-1093, 99-1108, 99-1094, 99-1105), rehearing and rehearing en banc denied (Jul 24, 2000)

## Negative Indirect History (U.S.A.)

*Distinguished by*

**▷**    38  Relume Corp. v. Dialight Corp., 63 F.Supp.2d 788 (E.D.Mich. Aug 26, 1999) (NO. 98-CV-72360) ★ ★ ★ ★ **HN: 20,21,22 (F.3d)**

**▷**    39  Depuy Orthopaedics Inc. v. Androphy, 2000 WL 297814, 53 U.S.P.Q.2d 1941 (N.D.Ill. Jan 19, 2000) (NO. 97 C 8017, 99 C 0068) ★ ★ ★ **HN: 5,17,22 (F.3d)** (BNA Version)

**H**    40  ANDREW H. CRAGG AND MICHAEL D. DAKE, JUNIOR PARTY, (APPLICATION 081461,402), v. ERIC C. MARTIN, JUNIOR PARTY, (APPLICATION 5,575,817), v. THOMAS J. FOGARTY, JAY A. LENKER, TIMOTHY J. RYAN AND KIRSTEN FREISLINGER, SENIOR PARTY, (APPLICATION 081463,836)., 2001 WL 1339890 (Bd.Pat.App & Interf. 2001) (NO. INTERFERENCE 104,192) ★ ★ **HN: 20 (F.3d)**

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

H    41  Sule v. Kloehn Co., Ltd., 149 F.Supp.2d 115 (D.N.J. Jun 18, 2001) (NO. CIV. A. 95-1090 (HAA)
         ★ ★
H    42  Cummins-Allison Corp. v. Glory Ltd., 2003 WL 355470 (N.D.Ill. Feb 12, 2003) (NO. 02 C 7008)
         ★ ★
H    43  Icon Health & Fitness, Inc. v. Sportcraft, Ltd., 272 F.Supp.2d 384 (D.N.J. Jul 18, 2003) (NO.
         CIV.A.01-5379 AMW) ★ ★ **HN: 2 (F.3d)**
H    44  NPC, Inc. v. International Precast Supply, Inc., --- F.Supp.2d ----, 2004 WL 2181756, 2004 DNH
         142 (D.N.H. Sep 28, 2004) (NO. CIV.03-029-JM) ★ ★

**Related References (U.S.A.)**

H    45  Al-Site Corp. v. Opti-Ray, Inc., 1992 WL 209330, 23 U.S.P.Q.2d 1235 (E.D.N.Y. May 26, 1992)
         (NO. CV-91-1770) (BNA Version)
H    46  Al-Site Corp. v. Opti-Ray, Inc., 1993 WL 455077, 28 U.S.P.Q.2d 1058 (E.D.N.Y. May 28, 1993)
         (NO. CV-91-1770, CV-92-4205) (BNA Version)
▶    47  Al-Site Corp v. VSI Intern., Inc., 842 F.Supp. 507 (S.D.Fla. Dec 20, 1993) (NO.
         91-0847-CIV-ATKINS, 92-0523-CIV-ATKINS, 92-2016-CIV-ATKINS, 93-0035-CIV-ATKINS)

H    48  Magnivision, Inc. v. Opti-Ray, Inc., 1995 WL 151778 (E.D.N.Y. Mar 30, 1995) (NO.
         CV-91-1770, CV-92-4205)
                                    *Dismissed by*
H    49  Magnivision, Inc. v. Opti-Ray, Inc., 77 F.3d 501 (Fed.Cir.(N.Y.) Nov 23, 1995) (TABLE, TEXT
         IN WESTLAW, NO. 94-1017, 94-1022, 95-1158, 95-1298, 96-1001, 96-1006)

H    50  Al-Site Corp. v. VSI Intern., Inc., 902 F.Supp. 1551, 36 U.S.P.Q.2d 1054 (S.D.Fla. Jun 12, 1995)
         (NO. 91-0847-CIV, 92-2016-CIV, 94-1920-CIV) (BNA Version)
H    51  Al-Site Corp. v. VSI International Inc., 38 Fed.Appx. 589, 2002 WL 1333615 (Fed.Cir. Jun 06,
         2002) (Not selected for publication in the Federal Reporter, NO. 02-1354, 02-1364)
H    52  Al-Site Corp. v. VSI Intern., Inc., 41 Fed.Appx. 387, 2002 WL 1543891 (Fed.Cir. Jul 01, 2002)
         (Not selected for publication in the Federal Reporter, NO. 02-1413)
H    53  Magnivision, Inc. v. Bonneau Co., 2003 WL 23320550 (C.D.Cal. Dec 18, 2003) (NO. CV
         91-2167-DT, CV 92-7553-DT, CV 97-8351 DT)

**Court Documents**
**Appellate Court Documents (U.S.A.)**

**U.S. Appellate Petitions, Motions and Filings**
     54  THE BONNEAU COMPANY, Petitioner, v. MAGNIVISION, INC., Respondent., 1997 WL
         33549481 (Appellate Petition, Motion and Filing) (U.S. Nov. 06, 1997) **Petition for a Writ of
         Certiorari** (NO. 97-785)
         ORIGINAL IMAGE OF THIS DOCUMENT WITH APPENDIX (PDF)
     55  THE BONNEAU COMPANY, Petitioner, v. MAGNIVISION, INC., Respondent., 1997 WL
         33549235 (Appellate Petition, Motion and Filing) (U.S. Dec. 23, 1997) **Opposition to Petition for
         a Writ of Certiorari** (NO. 97-785)
         ORIGINAL IMAGE OF THIS DOCUMENT (PDF)
     56  THE BONNEAU COMPANY, Petitioner, v. MAGNIVISION, INC., Respondent., 1998 WL
         34103161 (Appellate Petition, Motion and Filing) (U.S. Jan. 21, 1998) **Reply Brief** (NO. 97-785)
         ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

**C.A.Fed. Appellate Briefs**

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64
058 914 668, or their Licensors. All rights reserved.

57  MAGNIVISION, INC., Plaintiff-Appellant, v. THE BONNEAU COMPANY, Defendant-Appellee., 1997 WL 33539095 (Appellate Brief) (C.A.Fed. Jul. 16, 1997) **Opposition to the Combined Petition for Rehearing and Suggestion for Rehearing in Banc for Defendant** (NO. 95-1093)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

58  AL-SITE CORPORATION AND MAGNIVISION, INC., Plaintiffs-Appellants, v. VSI INTERNATIONAL, INC. and Myron Orlinsky, Defendants-Appellees., 1997 WL 33544957 (Appellate Brief) (C.A.Fed. Dec. 10, 1997) **Brief for Appellants Al-Site Corporation and Magnivision, Inc.** (NO. 97-1593)
ORIGINAL IMAGE OF THIS DOCUMENT WITH APPENDIX (PDF)

59  AL-SITE CORPORATION and Magnivision, Inc., Plaintiffs-Appellants, v. VSI INTERNATIONAL, INC. and Myron Orlinsky, Defendants-Cross-Appellants., 1998 WL 34097792 (Appellate Brief) (C.A.Fed. Jan. 20, 1998) **Brief of Defendants-Cross-Appellants VSI International Inc. and Myron Orlinsky** (NO. 97-1593, 98-1108)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

60  AL-SITE CORPORATION and Magnivision, Inc., Plaintiffs-Appellants, v. VSI INTERNATIONAL, INC. and Myron Orlinsky, Defendants/Cross-Appellants., 1998 WL 34097790 (Appellate Brief) (C.A.Fed. Mar. 06, 1998) **Reply and Opposition Brief of Appellants Al-Site Corporation and Magnivision, Inc.** (NO. 97-1593, 98-1108)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

61  AL-SITE CORPORATION and Magnivision, Inc., Plaintiffs-Appellants, v. VSI INTERNATIONAL, INC. and Myron Orlinsky, Defendants-Cross Appellants., 1998 WL 34097788 (Appellate Brief) (C.A.Fed. Apr. 15, 1998) **Reply Brief of Defendants-Cross Appellants VSI International Inc. and Myron Orlinsky** (NO. 97-1593, 98-1108)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

62  MAGNIVISION INC, Plaintiff Appellant, v. THE BONNEAU COMPANY and Foster Grant Group L P, Defendant/Cross Appellants., 1999 WL 33606790 (Appellate Brief) (C.A.Fed. Feb. 09, 1999) **Corrected Brief for Plaintiff Appellant Magnivision, Inc** (NO. -1094, -1105, -1108, 99-1093)
ORIGINAL IMAGE OF THIS DOCUMENT WITH APPENDIX (PDF)

63  MAGNIVISION INC, Plaintiff Appellant, v. THE BONNEAU COMPANY and Foster Grant Group L P, Defendant/Cross Appellants., 1999 WL 33606791 (Appellate Brief) (C.A.Fed. Apr. 21, 1999) **Combined Reply and Opposition Brief for Plaintiff-Appellant Magnivision, Inc** (NO. 1094, 1105, 1108, 991093)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

64  AL-SITE CORPORATION and Magnivision, Inc., Plaintiffs-Appellants, v. VSI INTERNATIONAL, INC., and Myron Orlinsky, Defendants/Cross-Appellants., 1999 WL 33645062 (Appellate Brief) (C.A.Fed. May. 13, 1999) **Brief by Appellants Al-Site Corporation and Magnivision, Inc. in Opposition to Combined Petition for** (NO. 97-1593, 98-1108)
ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

65  MAGNIVISION, INC, Plaintiff-Appellant, v. THE BONNEAU COMPANY and Foster Grant Group, L P, Defendants-Cross Appellants., 1999 WL 33611584 (Appellate Brief) (C.A.Fed. May. 19, 1999) **Brief for Appellee, Louis Caldera, Secretary of the Army** (NO. -1094, -1105, -1108, 99-1093)

**Dockets (U.S.A.)**

**C.A.Fed.**

66  MAGNIVISION v. BONNEAU CO, NO. 99-1094 (Docket) (C.A.Fed. Nov. 24, 1998)
67  MAGNIVISION v. BONNEAU CO, NO. 99-1093 (Docket) (C.A.Fed. Nov. 30, 1998)
68  MAGNIVISION v. BONNEAU CO, NO. 99-1108 (Docket) (C.A.Fed. Dec. 04, 1998)
69  MAGNIVISION v. BONNEAU CO, NO. 99-1105 (Docket) (C.A.Fed. Dec. 07, 1998)

**S.D.Fla.**

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.

70  AL-SITE CORPORATION v. VSI INTERNATIONAL, ET AL, NO. 1:92CV02016 (Docket)
    (S.D.Fla. Sep. 02, 1992)
71  MAGNIVISION, INC. v. VSI INTERNATIONAL, ET AL, NO. 1:94CV01920 (Docket) (S.D.Fla.
    Sep. 19, 1994)

© Copyright 2004 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64
058 914 668, or their Licensors. All rights reserved.